J. Noah Hagey, Esq. (SBN: 262331)
    hagey@braunhagey.com
Adam Cashman (SBN: 255063)
    cashman@braunhagey.com
J. Tobias Rowe, Esq. (SBN: 305596)
    rowe@braunhagey.com
H. Chelsea Tirgardoon (SBN: 340119)
    tirgardoon@braunhagey.com
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel / Fax: (415) 599-0210

*Attorneys for Plaintiff Death Wish Coffee, LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| DEATH WISH COFFEE, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>LIQUID DEATH, a/k/a SUPPLYING DEMAND INC.,<br><br>    Defendant. | Case No. 2:25-cv-9583<br><br>**COMPLAINT FOR:**<br><br>**(1) Trademark Infringement**<br>**(2) False Designation of Origin**<br>**(3) Determination of Non-Registrability of Trademark**<br>**(4) Declaratory Judgment**<br>**(5) Unfair Competition**<br><br>**JURY TRIAL DEMANDED** |

Case No. 2:25-cv-9583
COMPLAINT

Plaintiff Death Wish Coffee, LLC ("Death Wish" or "Plaintiff"), brings this Complaint against Supplying Demand, Inc. d/b/a Liquid Death ("Liquid Death" or "Defendant"), and alleges, on personal knowledge as to its own actions and on information and belief as to the actions of others, as follows:

## INTRODUCTION

1. Plaintiff Death Wish is one of the largest and most successful premium coffee brands in the country. Since its founding in 2012, it has sold critically-acclaimed coffee under its unique DEATH WISH COFFEE CO.® registered trademark and associated trademarks (the "DEATH WISH Marks") at thousands of major retail locations nationwide and online.

2. Death Wish brings this action to enjoin Liquid Death from confusing consumers and trading on Death Wish's brand and goodwill by launching competing DEATH-branded coffee beverages (the "Infringing Coffee Products"). Straying from its current business of selling sparkling water under the "LIQUID DEATH" brand, Liquid Death recently applied to register the trademarks LIQUID DEATH and LIQUID DEATH DEATHUCCINO with the United States Patent and Trademark Office for use in connection with coffee and coffee-flavored beverages. Upon information and belief, Liquid Death intends to launch these Infringing Coffee Products in a matter of months, in or around January 2026 or soon thereafter.

3. The Infringing Coffee Products will confuse consumers, infringe the DEATH WISH Marks, and irreparably harm Death Wish and its valuable brand. The Infringing Coffee Products will duplicate the dominant element of Death Wish's registered trademarks – *i.e.*, DEATH. They will likely appear in the same retailers and side-by-side with Death Wish's products in stores, where Death Wish sells both ready-to-drink canned coffee as well as other coffee beans and coffee products. And they will share similar consumer bases and advertising, distribution, and marketing channels. Liquid Death is well aware of Death Wish's established trademark rights in the coffee market, but plans to launch the Infringing Coffee Products anyway. In

short, this is a dead-to-rights case of willful trademark infringement, as illustrated by the striking similarities of the parties' existing trade dress, which Liquid Death has indicated is representative of the Infringing Coffee Products:

**DEATH CONFUSION**

 

4. Prior to filing this suit, Death Wish requested that Liquid Death voluntarily refrain from launching the Infringing Coffee Products and withdraw its infringing applications. Liquid Death refused to do so and has confirmed that the Infringing Coffee Products are "forthcoming" and will be made "available in the marketplace."

5. Meanwhile, in a sign of its disregard for Death Wish's trademark rights in the coffee space and a harbinger of deliberate infringement to come, Liquid Death has begun advertising even its non-coffee energy drinks by claiming that they "feel[] like a coffee."

6. Death Wish therefore brings this suit to halt Liquid Death's willful infringement and seek preliminary and permanent injunctive relief to prevent the irreparable harm it will suffer if the Infringing Coffee Products are permitted to launch.

# THE PARTIES

7. Plaintiff Death Wish is a premium coffee roaster with its headquarters in Saratoga Springs, New York. Death Wish is a limited liability company organized under the laws of the State of Delaware. Death Wish markets and sells critically acclaimed coffee and related products under the registered trademark DEATH WISH COFFEE CO.® and related DEATH WISH Marks.

8. Defendant Liquid Death, incorporated as Supplying Demand, Inc., is upon information and belief, a corporation organized under the laws of the State of Delaware with its principal place of business in Los Angeles, California.

# JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338. The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

10. Venue is proper in this district under 28 U.S.C. § 1391(b) because Liquid Death resides in this district and because a "substantial part of the events or omissions" on which Death Wish's claims are based occurred in this district.

11. This Court has personal jurisdiction over Liquid Death because Liquid Death's principal place of business is located in this district and because Liquid Death has engaged in the acts and omissions giving rise to Death Wish's claims in this district.

# FACTS

**A.    The DEATH WISH Marks and Brand**

12. Death Wish is a renowned and leading coffee roaster and seller of beloved fair-trade coffees under its DEATH WISH Marks. Founded in 2012 in Saratoga Springs, New York, Death Wish has become one of the top-selling premium coffee brands in the United States and is sold in all 50 states at thousands of retailers. Its coffees are renowned for their flavor, quality, and healthy kick of caffeine.

13. Death Wish sells its products under its signature DEATH WISH Marks, which include DEATH WISH COFFEE CO.® and other DEATH-formative marks such as DEATH CUPS® and GINGERDEAD® (the "DEATH WISH Marks"). It owns the following federal trademark registrations for the DEATH WISH Marks, in addition to other trademark registrations in the United States and internationally:

**Selected DEATH WISH Trademark Registrations**

| | |
|---|---|
| DEATH WISH COFFEE CO.® | Reg No. 4605090<br>Class 30 for Coffee; Coffee beans |
| DEATH WISH COFFEE CO.® | Reg No. 5275128<br>Class 30 for Coffee; Coffee beans |
| DEATH WISH COFFEE CO.® | Reg. No. 7465589<br>Class 25 for Clothing and apparel, namely, shirts, t-shirts, tank tops, sweatshirts, hoodies, jackets, windbreakers, shorts, sweatpants, pajama pants, hats, caps being headwear, scarves, socks, baby bodysuits |
| DEATH CUPS® | Reg. No. 5412124<br>Class 30 for Coffee, espresso; Coffee-based beverages, espresso-based beverages; preparations for making beverages, namely, concentrates and powders for making coffee, tea, coffee-based beverages, espresso-based beverages; pods, namely, cartridges for making coffee, espresso, tea, hot cocoa, coffee-based beverages, espresso-based beverages; Coffee, espresso contained in single serving or portion controlled containers, capsules and pods; Coffee, espresso contained in single serving or portion controlled containers, capsules and pods for use in brewing machines and coffee makers. |
| GINGERDEAD® | Reg. No. 7025542<br>Class 30 for coffee, espresso, tea, cocoa; coffee-based beverages, espresso-based beverages, tea-based beverages, cocoa- |

|  | based beverages; preparations for making beverages, namely, concentrates and powders for making coffee, tea, hot cocoa, coffee-based beverages, espresso-based beverages, tea-based beverages and cocoa-based beverages; pods, namely, cartridges for making coffee, espresso, tea, hot cocoa, coffee-based beverages, espresso-based beverages, tea-based beverages and cocoa-based beverages; coffee, espresso, tea or cocoa contained in single serving or portion controlled containers, capsules and pods; coffee, espresso, tea or cocoa contained in single serving or portion controlled containers, capsules and pods for use in brewing machines and coffee makers; powdered coffee, espresso, tea or cocoa; ground coffee, espresso, tea or cocoa |
|---|---|

14. Death Wish's longstanding trademark rights have been repeatedly recognized by the U.S.P.T.O. Death Wish's Trademark Registration No. 4605090 for DEATH WISH COFFEE CO.® was registered by the U.S.P.T.O. on September 16, 2014 and became incontestable as a matter of law on June 8, 2020. Death Wish's Trademark Registration No. 5275128 for the DEATH WISH COFFEE CO.® logo was registered by the U.S.P.T.O. on August 29, 2017 and attained incontestable status on June 9, 2023. And Death Wish's Registration No. 5412124 for DEATH CUPS® was registered by the U.S.P.T.O. on February 27, 2018 and attained incontestable status on January 26, 2024.

15. Through years of dedicated effort producing and marketing high-quality coffee, Death Wish has fostered a unique brand image and inspired a loyal and enthusiastic customer following.

16. Death Wish has received widespread praise and national attention, from having been featured on *Good Morning America* to, in 2016, being the smallest company ever to run a TV ad at the Super Bowl. Death Wish also enjoys significant social media engagement, with hundreds of thousands of followers on Instagram and

TikTok, and has received multiple product awards in "best of lists" across numerous websites and publications.

17. Today, Death Wish products are sold through Death Wish Coffee's own website (www.deathwishcoffee.com), via online retailers such as Amazon, and in major U.S. retail chains, including Walmart, Kroger, Target, and Albertsons/Safeway.

18. Since its founding, Death Wish has made substantial investments to market, advertise, and grow its brand and consumer goodwill under its DEATH WISH Marks.

19. Death Wish diligently protects its trademark rights. When Death Wish's success has spawned attempts at imitation, Death Wish has enforced its trademarks against would-be infringers and has prevented infringing marks from being used in the marketplace. Death Wish has won multiple injunctions in federal court and judgments at the U.S.P.T.O. Trademark Trial and Appeal Board against would-be infringers.

20. As a result of Death Wish's extensive promotion of its intellectual property and the widespread success of its products, the DEATH WISH Marks are among the most unique and valuable brands in the coffee industry.

**B.    Defendant Liquid Death and the Infringing Coffee Products**

21. Defendant Liquid Death is best known for selling sparkling water under the "Liquid Death" brand. Liquid Death claims to have begun its selling of sparkling water products in 2019, years after Death Wish adopted and registered the DEATH WISH Marks for coffee.

22. While Liquid Death was years behind Death Wish Coffee in adopting a DEATH-centric brand, the two companies have coexisted because they operate in wholly different market areas: one sells coffee and the other sells sparkling water.

23. The situation has even produced some friendly ribbing on social media, as demonstrated by the following March 2, 2022 exchange on Twitter (now X):

MUTUAL RECOGNITION



24. As Liquid Death acknowledged above, Death Wish and Liquid Death have been able to coexist in the market because Liquid Death's products are "water, not coffee."

25. This coexistence is coming to an end. Flush with investment valuing the company at $1.4 billion, Liquid Death is preparing to invade Death Wish's market territory and infringe Death Wish's trademarks by selling DEATH-branded coffee beverages.

26. On May 2, 2025, Liquid Death filed a host of DEATH-formative trademark applications for coffee beverages with the U.S.P.T.O.: two for LIQUID DEATH for "coffee-based beverages" and "non-alcoholic beverages flavored with coffee" (Application Nos. 99166850 and 99166851), and two for LIQUID DEATH DEATHUCCINO for the same coffee products (Application Nos. 99166846 and 99166849) (together, the "Infringing Applications").

27. In connection with each of the Infringing Applications, Liquid Death submitted a sworn declaration to the U.S.P.T.O. that Liquid Death "has a bona fide intention to use the mark in commerce and had a bona fide intention to use the mark in commerce as of the application filing date on or in connection with the goods/services in the application."

28. This fits Liquid Death's pattern of applying to register trademarks ahead of launching product line extensions as part of retail resets in January of the following year. For example, Liquid Death applied to register trademarks for its ROOTBEER WRATH, DOCTOR DEATH, and KILLER COLA soda products in July 2024, then launched those products in January 2025.

29. Liquid Death also applied to register trademarks for its forthcoming energy drink products, LIQUID DEATH SCARY STRAWBERRY and DEATH TO DROWSY, in June 2025 and recently announced that those products will be released in January 2026.

30. In light of Liquid Death's May 2025 filing of the Infringing Applications and its history of similarly-timed product line extensions, Death Wish is informed and believes that Liquid Death intends to launch the Infringing Coffee Products in or around January 2026 or soon thereafter.

### C. Death Wish Coffee's Good Faith Efforts to Avert Litigation

31. Prior to filing suit, Death Wish Coffee contacted Liquid Death to request that it desist from its planned infringement. On July 29, 2025, Death Wish Coffee's counsel sent a letter to Liquid Death's in-house counsel detailing Death Wish Coffee's trademark rights and explaining the confusion that would ensue if Liquid Death proceeded to launch the Infringing Coffee Products. (Ex. 1 (July 29, 2025 Letter).)

32. On August 5, 2025, Liquid Death's in-house counsel responded via email and stated that Liquid Death would not provide a substantive response until September 5, 2025. On August 7, 2025, Liquid Death assured Death Wish Coffee that it would not launch the Infringing Coffee Products in the interim.

33. On September 5, 2025, Liquid Death sent a letter responding to Death Wish Coffee's cease-and-desist. The letter confirmed that the Infringing Coffee Products are "forthcoming" and will be made "available in the marketplace."

34. Liquid Death's letter also generically denied that confusion was likely. It included the following comparison to illustrate what the Infringing Coffee Products would look like side-by-side with Death Wish Coffee's products.

**DEATH CONFUSION**

 

35. Given the striking similarities between these products, the example provided with Liquid Death's letter only confirms that the Infringing Coffee Products are likely to cause confusion.

36. In subsequent correspondence, Death Wish has implored Liquid Death to abandon its unlawful plan to infringe the DEATH WISH Marks without judicial intervention, but Liquid Death has refused to do so. (Ex. 2 (September 30, 2025 Letter).)

37. Meanwhile, in a sign of its disregard for Death Wish's trademark rights in the coffee space and a harbinger of deliberate infringement to come, Liquid Death has begun advertising even its non-coffee energy drinks by claiming that they "feel[] like a coffee", including in the following image posted on social media by Liquid Death's CEO:

**BRAND ENCROACHMENT**



38. Given Liquid Death's refusal to abandon its launch of the Infringing Coffee Products, Death Wish has no choice but to bring suit to prevent confusion with Death Wish's valuable brand and marks.

**D.  The Infringing Coffee Products Will Infringe the DEATH WISH Marks**

39. The Infringing Coffee Products will confuse consumers, infringe the DEATH WISH Marks, and irreparably harm Death Wish and its valuable brand if they are permitted to launch.

40. Each of the relevant factors used by courts in this Circuit to assess likelihood of confusion – *i.e.*, the "*Sleekcraft*" factors articulated by the Ninth Circuit in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) – demonstrate that consumer confusion is overwhelmingly likely.

41. *Strength of Plaintiff's Mark*. The DEATH WISH Marks are both conceptually and commercially strong. They are highly conceptually distinctive because they do not inherently describe anything about coffee. Rather, they are associated with coffee solely by virtue of Death Wish's extraordinary commercial success in creating popular, widely-loved products and a unique brand identity that is widely recognized by the consuming public.

42. *Strength of Defendant's Mark*. At the same time, the DEATH WISH Marks are in danger of being swamped in the coffee marketplace by Liquid Death's massive promotional spending. Liquid Death has attained prominence in the sparkling water category by inundating internet media and other advertising channels with promotions for its "Liquid Death" sparkling water products. When Liquid Death aims this massive promotional machine at the market for coffee beverages, it is likely to cause "reverse confusion" and deceive consumers into believing Death Wish and the DEATH WISH Marks are associated or affiliated with Liquid Death. *Similarity of the Marks*. The LIQUID DEATH and LIQUID DEATH DEATHUCCINO marks (the "Infringing Marks") are highly similar in sight, sound, and meaning to the DEATH WISH Marks, including DEATH WISH COFFEE CO.®, DEATH CUPS®, and GINGERDEAD®. Among other similarities, the Infringing Marks duplicate the dominant element of the DEATH WISH Marks – *i.e.*, DEATH – which is highly distinctive of Death Wish and its products. That similarity is not merely theoretical: mainstream publications have already juxtaposed the parties' respective DEATH-branded products. For example, *Men's Health* recently ran an article profiling the two companies' "punk-rock-style" DEATH-branded beverages side-by-side, highlighting their nearly identical aesthetic and shared emphasis on irreverent "death"-themed branding. Such real-world press coverage underscores that consumers, and even seasoned media outlets, already perceive a close association between the brands, confirming that confusion is likely and that similarities weigh more heavily than differences.

43. *Marketing Channels*. The Infringing Coffee Products will share similar or identical marketing and distribution channels with Death Wish's coffee products. Among other similarities, the Infringing Coffee Products will likely appear in the same retailers and in close proximity to Death Wish's products in stores, where Death Wish sells both ready-to-drink canned coffee as well as other coffee beans and coffee products.

44. *Type of Goods*. The Infringing Coffee Products will be relatively low-priced consumer goods for which customers will exercise a relatively low degree of care, rendering them highly susceptible to consumer confusion.

45. *Defendant's Intent*. There is no doubt that Liquid Death's infringement is knowing and willful. In addition to Liquid Death's longstanding awareness of Death Wish and its products, Death Wish specifically notified Liquid Death that the Infringing Coffee Products would cause consumer confusion and infringe the DEATH WISH Marks. Liquid Death has signaled it intends to proceed with its infringement despite Death Wish's senior trademark rights.

46. As these *Sleekcraft* factors demonstrate, the Infringing Coffee Products are highly likely to confuse consumers and will infringe the DEATH WISH Marks if they are permitted to launch.

### E. Death Wish Faces Irreparable Harm from the Infringing Coffee Products

47. The harm that will be inflicted on Death Wish by Liquid Death's sales of the Infringing Products is severe and irreparable. In the highly competitive coffee market, the effects of even initial confusion amongst consumers are likely to be momentous, particularly given the high degree of similarity between the Infringing Marks and the DEATH WISH Marks.

48. Liquid Death's use of the Infringing Marks is highly likely to confuse consumers into believing that Liquid Death's Infringing Coffee Products are manufactured, approved, sponsored, endorsed, or guaranteed by, or are in some way affiliated with Death Wish and the DEATH WISH Marks. Such confusion irreparably reduces the distinctive nature of the valuable DEATH WISH Marks and their function as source identifiers for Death Wish's products.

49. Consumers who are deceived into purchasing Liquid Death's Infringing Coffee Products will associate those products with the DEATH WISH Marks and brand, damaging Death Wish's hard-won goodwill and reputation for quality.

1  Moreover, consumers who are exposed to the Infringing Coffee Products before
2  trying Death Wish's products will likely be deceived into thinking that Death Wish,
3  rather than Liquid Death, is the infringing party.

4      50.    Death Wish also faces incalculable harm in the form of lost and diverted
5  sales that would accrue to Death Wish but for Liquid Death's infringement.

6      51.    Death Wish's loss of control over its brand and diverted sales as a result
7  of Liquid Death's infringement will be irreparable and cannot be remedied by
8  monetary damages alone.

9      52.    Accordingly, Death Wish will suffer irreparable harm to its brand and
10 business – in addition to substantial monetary damages – if Liquid Death's
11 infringement is not enjoined.

## CAUSES OF ACTION

### First Cause of Action

### (Federal Trademark Infringement – 15 U.S.C. § 1114)

15     53.    Plaintiff incorporates by reference the facts and allegations set forth in
16 each of the preceding paragraphs as though fully set forth herein.

17     54.    Plaintiff owns all right, title, and interest in the DEATH WISH Marks.

18     55.    Through the conduct alleged above, Defendant's imminent use in
19 commerce of the Infringing Marks infringes Plaintiff's rights in the registered
20 DEATH WISH Marks and violates 15 U.S.C. § 1114 because it renders Defendant's
21 Infringing Coffee Products confusingly similar to the well-known DEATH WISH
22 Marks and products. Defendant's unauthorized use of the Infringing Marks will
23 create the erroneous impression in consumers' minds that the Infringing Coffee
24 Products have been manufactured, approved, sponsored, endorsed, or guaranteed by,
25 or are in some way affiliated with Plaintiff and the registered DEATH WISH Marks.

26     56.    Defendant's infringement of the registered DEATH WISH Marks will
27 cause irreparable injury to Plaintiff by, inter alia, destroying consumers' unique
28 association of the DEATH WISH Marks with Plaintiff's products.

57. Plaintiff has no adequate remedy at law for Defendant's misconduct. Unless Defendant is enjoined and restrained from its infringement, consumers will be confused and Plaintiff's injuries will continue to occur.

58. Plaintiff also is entitled to recover from Defendant any gains, profits, and advantages as a result of Defendant's infringement, in an amount to be proven at trial.

59. Defendant's intentional and willful misconduct renders this an "exceptional case," entitling Plaintiff to treble damages and attorney's fees pursuant to 15 U.S.C. § 1117.

## Second Cause of Action
## (False Designation of Origin – 15 U.S.C. § 1125(a))

60. Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

61. Plaintiff owns all right, title, and interest in the DEATH WISH Marks.

62. Through the conduct alleged above, Defendant's imminent use in commerce of the Infringing Marks infringes Plaintiff's rights in the DEATH WISH Marks and violates 15 U.S.C. § 1125(a) because it renders Defendant's Infringing Coffee Products confusingly similar to the well-known DEATH WISH Marks and products. Defendant's unauthorized use of the Infringing Marks will create the erroneous impression in consumers' minds that the Infringing Coffee Products have been manufactured, approved, sponsored, endorsed, or guaranteed by, or are in some way affiliated with Plaintiff and the DEATH WISH Marks. Such use constitutes a false designation of origin within the meaning of 15 U.S.C. § 1125(a).

63. Defendant's imitation of the DEATH WISH Marks will cause irreparable injury to Plaintiff by, inter alia, destroying consumers' unique association of the DEATH WISH Marks with Plaintiff's products.

64. Plaintiff has no adequate remedy at law for Defendant's misconduct. Unless Defendant is enjoined and restrained from its acts of unfair competition and

COMPLAINT

infringement, consumers will be confused and Plaintiff's injuries will continue to occur.

65. Plaintiff also is entitled to recover from Defendant any gains, profits, and advantages as a result of Defendant's unfair competition and infringement, in an amount to be proven at trial.

66. Defendant's intentional and willful misconduct renders this an "exceptional case," entitling Plaintiff to treble damages and attorney's fees pursuant to 15 U.S.C. § 1117.

## Third Cause of Action

## (Determination of Non-Registrability of Trademarks – 15 U.S.C. § 1119)

67. Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

68. Pursuant to 15 U.S.C. § 1119, the Court has authority to "determine the right to registration" and "rectify the register" with respect to Defendant's pending applications to register the Infringing Marks with the U.S.P.T.O.

69. Defendant's Application No. 99166850 to register LIQUID DEATH cannot be granted because Defendant's registration and use of the applied-for mark with respect to coffee or related goods, including those set forth in the application, is likely to cause confusion with Plaintiff's registered DEATH WISH Marks.

70. Defendant's Application No. 99166851 to register LIQUID DEATH cannot be granted because Defendant's registration and use of the applied-for mark with respect to coffee or related goods, including those set forth in the application, is likely to cause confusion with Plaintiff's registered DEATH WISH Marks.

71. Defendant's Application No. 99166846 to register LIQUID DEATH DEATHUCCINO cannot be granted because Defendant's registration and use of the applied-for mark with respect to coffee or related goods, including those set forth in the application, is likely to cause confusion with Death Wish's registered DEATH WISH Marks.

72. Defendant's Application No. 99166849 to register LIQUID DEATH DEATHUCCINO cannot be granted because Defendant's registration and use of the applied-for mark with respect to coffee or related goods, including those set forth in the application, is likely to cause confusion with Plaintiff's registered DEATH WISH Marks.

73. Plaintiff will be injured by Defendant's registration and use of the marks that are the subject of the Infringing Applications.

74. Accordingly, Plaintiff is entitled to a determination that Defendant has no right to register the marks that are the subject of the Infringing Applications and that the Infringing Applications must be rejected.

## Fourth Cause of Action

## (Declaratory Judgment – 28 U.S.C. §§ 2201-2202)

75. Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

76. Defendant's imminent use and attempted registration of the Infringing Marks to sell the coffee and coffee-related products infringes Plaintiff's rights in the DEATH WISH Marks and is likely to cause confusion.

77. Despite receiving notice that its imminent use of the Infringing Marks would infringe Plaintiff's rights, Defendant has refused to refrain from such use or to withdraw its Infringing Applications to the U.S.P.T.O.

78. As such, there is a substantial, immediate and justiciable controversy between the parties in that Defendant seeks to use the Infringing Marks in commerce in connection with coffee and coffee-related products, while Plaintiff contends that such use infringes Plaintiff's rights in the DEATH WISH Marks.

79. Plaintiff will be damaged by Defendant's use and attempted registration of the Infringing Marks.

80. Plaintiff accordingly seeks a declaratory judgment that Defendant's unauthorized use of the Infringing Marks or any other "DEATH"-formative mark in

connection with the sale, marketing or distribution of coffee would infringe Plaintiff's rights in the DEATH WISH Marks.

### Fifth Cause of Action

### (Unfair Competition – Cal. Bus. & Prof. Code § 17200 et seq.)

81. Plaintiff incorporates by reference the facts and allegations set forth in each of the preceding paragraphs as though fully set forth herein.

82. Defendant's imminent use of the Infringing Marks and sales of the Infringing Coffee Products in a manner that is likely to confuse and deceive consumers is unlawful, unfair, and/or fraudulent and constitutes unfair competition within the meaning of California's Unfair Competition Law, codified in Business and Professions Code Section 17200.

83. Defendant's unfair competition will cause irreparable injury to Plaintiff by, inter alia, destroying consumers' unique association of the DEATH WISH Marks with Plaintiff's products.

84. Plaintiff has no adequate remedy at law for Defendant's misconduct. Unless Defendant is enjoined and restrained from continuing its acts of unfair competition and infringement, consumers will be confused and Plaintiff's injuries will continue to occur.

85. Plaintiff also is entitled to recover from Defendant any gains, profits, and advantages as a result of Defendant's unfair competition and infringement, in an amount to be proven at trial.

86. Plaintiff also is entitled to exemplary and/or punitive damages as available at law for Defendant's willful and intentional unfair competition and misuse of Plaintiff's DEATH WISH Marks.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Death Wish prays that the Court issue the following relief:

A. Preliminarily and permanently enjoin Defendant from using any version of the Infringing Marks, any other "DEATH"-formative mark, or any other mark that infringes Plaintiff's rights in the DEATH WISH Marks, in connection with the sale, offering for sale, advertising or marketing of any coffee or coffee-related products in the United States.

B. Award Plaintiff its reasonable attorney's fees as well as the costs of this action in accordance with 15 U.S.C. § 1117.

C. Declare that Defendant's unauthorized use of the Infringing Marks or any other "DEATH"-formative mark in connection with the sale, marketing or distribution of coffee would infringe Plaintiff's rights in the DEATH WISH Marks.

D. Declare that Defendant has no right to register the marks applied for in Application Nos. 99166850, 99166851, 99166846, and 99166849 and enter an injunction directing either Liquid Death to expressly abandon these applications or the Director of the U.S.P.T.O. to refuse registration of these applications.

E. Award Plaintiff punitive damages as available for Defendant's willful and intentional unfair competition and misuse of Plaintiff's DEATH WISH Marks.

F. Award such other and further relief as this Court deems lawful, equitable, and proper.

Dated: October 7, 2025

Respectfully Submitted,

BRAUNHAGEY & BORDEN LLP

By: */s/ J. Noah Hagey*
J. Noah Hagey

*Attorneys for Plaintiff Death Wish Coffee, LLC*

# **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Death Wish Coffee, LLC hereby demands a jury trial of all claims and causes of action triable before a jury.

Dated: October 7, 2025

BRAUNHAGEY & BORDEN LLP

By: /s/ J. Noah Hagey
J. Noah Hagey

*Attorneys for Plaintiff Death Wish Coffee, LLC*